Ruffin, Chief Justice,
having stated the pleadings and proofs as above, proceeded. — These three causes have been properly brought on and argued together; for nearly the same questions arise in each, and all those that are important to the rights of the parties appear upon the pleadings in the original suit.
The cross-bill of Birchett and Ormond is chiefly for discovering from Falls as to the matters set up by those plaintiffs in their answer as defendants to his bill. It charges only one new fact, or rather puts that fact more distinctly and in a stronger light than their answer did. That is, that Falls was on the land with Birchett, and knew of his intention to purchase, and made no objection, but expressed his satisfaction. But the allegation is positively denied by Falls-, and there is no evidence to sustain it. It would require very strong evidence to do so, for Birchett, within whose knowlege, as well as that of Falls, it must, if true, have been, does not venture to state it in that way in his answer; but only in general terms, that they inferred he had abandoned, because Carpenter had *267 offered to sell the land for several months, and they had not understood that Falls had forbidden him. The have examined but a single witness with a view to this point (Starns); and he says only, that on the 22d of August, Falls mentioned that those persons had gone to buy the land. But that does not tend to show his assent to the purchase, and is entirely consistent with his answer, that he himself heard of their intention only on that day, and after they had gone. It reached him as a piece of common information, and in the same way he. may have mentioned it. His conduct immediately before, and subsequent, renders the assertion of the bill incredible. All the other parts of this cause,'which can oppose the relief to Falls, are involved in the original one, and may therefore be disposed of with that.
Equity will contract,eU fair in its the’seore merely of abandon-“®nt i here cannot baa gort.upon^ which that tasked in equity, in which the facis on , which it was asked. would not delfeat an action at law on the contract.
*267 The cross-bill of Carpenter’s heirs was probably filed principally to enable the plaintiffs therein to impeach the deed to Birchett and Ormond upon their alleged fraud, in case a decree should be refused to Falls in the original suit; and therefore Falls was made a party, that it might appear that his interest had been put out of the plaintiff’s way. It brings forward no new matter against Falls; and if the matters charged, and admitted or proved, be insufficient to bar Falls from specific execution, still less will they authorise' a decree that he shall give up the agreement. Equity may refuse to help either party, and leave both to law; but there is no ground in this Court to cancel a contract, fair in its origin, upon the score merely of default or abandonment. There cannot be a case of that sort, upon which that relief could be asked in equity, m which the facts, on which it was asked, would not defeat an action at law on the contract. As a bill of d^scovery simply, it has entirely failed with respect to Falls; who denies that he had either rescinded or abandoned the contract. The plaintiffs can have no relief, therefore upon it, if Falls should be found entitled to a decree in his suit; for if Birchett and Ormond practised , i . , - . , , . the grossest fraud in obtaining the deed, — although it may affect the costs, — it becomes immaterial to these plaintiffs *268 as soon as their interest in the subject ceases, and it is shown to belong, in the view of this Court, to the other party, Falls. It may be remarked, however, that the case is much stronger for Falls in the suit by the Carpenters, than upon his own bill; because there is important evidence competent in the former, which he cannot read against Birchett and Ormond in his suit, which is, the testimony of Johnston and M‘Kee as to the declarations of Carpenter, the father, after he made the deeds. Falls had a right to use those declarations as against Carpenter, both to repel the imputation of abandonment on his part, and the charge of surprise on Carpenter, which the bill of his heirs says, ought to prevent the acceptance of the money by him from being considered as a confirmation. We think, indeed, that there is no ground for the allegation of surprise; for it is clear to our minds, from the testimony of those witnesses, and that of Adderholt, and from many other concurring circumstances, that Carpenter never considered the contract abrogated, or that he could honestly sell against the consent of Falls; and that he would not have sold without his consent, or supposed consent. He may not have known, and probably did not know, what remedy a Court of Equity would give on the contract; and may have thought that all Falls could have done, at any time, was to sue for the penalty, and that even that was then out of his power. But he had no idea, that he had let Falls off; or that Falls wished to be off. He constantly meant to convey to Falls, if he could'pay the money. He probably believed that Falls would not, after all his indulgence, stand in the way of a sale to another, if it became necessary for Carpenter to have money, and Falls could not raise it. But that was all. He had in his own mind gone no further, if even that far. That was the reason why he spoke of “ the bond being dead,” and at the same time inquired whether Falls was willing to give it up. Whether Falls could sue him, or not, he had always a regard to the interest and wishes of Falls; and however deficient his knowledge of artificial equity; or whatever the grade of his intellectual capacity at the time may have been, he seems to have retained to *269 the last that best kind of sense, which prompted him to be an honest man, and observe his contracts in good faith, according to their substantia] meaning, as understood by the parties. As against his heirs, therefore, the inference from these facts is strong that the contract was considered by the parties to be a subsisting one; and it is rendered conclusive, by the subsequent declarations, which are express to that purpose. That Carpenter was deficient in understanding to make a contract, or transact ordinary business, there is no evidence that will bear stating; much less that he was incompetent to acts proper to the performance of a previous fair contract. The argument that he was ignorant that the contract was not binding, and therefore his acts and declarations, under the belief that it was binding, ought not to be deemed a confirmation, is altogether fallacious. It is founded upon the cases of conveyances obtained by trustees, tutors or guardians. They are voidable, and cannot be confirmed by a second deed, unless the first deed was known to be not binding, and the second was intended simply to make it so. The meaning is, that the last shall not cure the vice of the first, unless it was intended to have that very effect; which cannot be, if the maker thought himself obliged by the one to make the other. But that has no application to the case of a contract, which has no vice, but was fair; in respect of which, the only question is, whether it continued to be a contract between the parties.. Acts done under it establish its subsistence. They do not constitute a case of confirmation, but of performance. There could not be a doubt, therefore, that in the actual state of the case, as against Carpenter, the plaintiff, Falls, would be entitled to specific performance, if the legal title were now in his heirs. Their cross-bill must consequently be dismissed, as against Falls and those claiming under him, and with costs. That brings us to the inquiry, what relief he is entitled to, as against Birchett and Ormond, in the original suit.
The rule, that a deed, obtained from one who had executed a former voidable instrument, is not binding, unless he knew that the first was not obligatory, and gave the second expressly to cure the vice of the first, does not apply to a contract which has no vice, but is fair; and in respect to which the only question is, whether it continues to bea contract between Acts done under such a contract establish enceUland" they do not case ofeoní firmation, perform-1*' anee.
*269 That question was made in the argument to depend mainly upon the right of Falls to have called for a deed from Carpenter, upon the facts existing before, and on the *270 °f ■A-11®1184’ 1829, as those facts appear upon the proofs, exclusive of the subsequent declarations and acceptance of the purchase-money by Carpenter. Birchett and Qrmond are purchasers, who have not paid any money, and consequently stand in Carpenter’s shoes, in respect to the equity of Falls: but that equity must be established against them, by evidence that is competent against them. ^he court wjq consider the case in that light, and throw # » 7 out of view the testimony of Johnston and M‘Kee, and the Payment °f the balance of the price.
The deposition of Robert Dixon, must, for a like reason, be rejected upon this part of the case. Having released to his companions before Carpenter filed his bill, he was not made a party defendant to it, and his deposition was therefore competent for Birchett and Ormond against Carpenter. But it cannot be read against Falls, as to whom, the release pendente lite is a nullity, and who must have a decree against the witness, if he gets one at all. Indeed, his liability for the costs, although in discretion, would be a sufficient objection, according to Barrett v. Gore, 3 Atk. 401. That case has been questioned in some of the Courts of this country. Nevertheless we approve of it; because it is a safe rule, that a witness should be entirely disinterested, and in a case of this kind, the Court must, upon its settled principles, decree costs against Dixon, if any decree be made against him.
In the point of view in which the case is now to be regarded, the offers of Carpenter to sell to others, and the declarations of him and his son, that Falls had agreed that he might do so, must also be put aside, because the knowledge of those circumstances is not brought home to the plaintiff.
It may be remarked here, however, that upon one ground, Falls might be found upon investigation, to have a substantive equity against those purchasers, distinct from that he might have had against their common vendor. Supposing that the contract had not been expressly rescinded, but that Carpenter thought that it had been abandoned by Falls, and under that impression sold to another, who contributed to produce or confirm that *271 impression, and represented that Falls had abandoned expressly in favour of the person seeking the second purchase: it would seem to constitute a case of deliberate deception by active means for the sake of gain, which ought to deprive the purchaser of all the advantage of his deed, and make it subservient to the interest of the party, whose conduct and wishes had been misunderstood by him who made the deed, and misrepresented by him who took it. In this aspect of the case, Carpenter’s own interest is to be considered as gone at all events, either upon his contract with Falls, or his deed to the others, and the question is, to which of them ought it to go? Carpenter honestly disabled himself from conveying to Falls. He knew he had made default, and from that he may possibly have inferred that the contract was abandoned by Falls. He was ignorant that, in fact, it was no,t abandoned. But Birchett and Ormond knew, and fully knew, better. Their answer, indeed, states that Carpenter told them that the bond was void, and that Falls had abandoned — intending to imply a negative pregnant to the proposition, that such remark fell from them. But they do not say that affirmatively ; and the answer being silent as to that charge of the bill, the unequivocal testimony of the witness (Adderholt) proves it; and also, that Carpenter, deemed it a most material circumstance that Falls was willing the other should buy. Admit that Carpenter might have insisted on the default as a forfeiture ; yet if he did not, and would then have conveyed to Falls, upon the footing of their former contract, in preference to conveying to Birchett and Ormond, upon a new contract, against the wishes of Falls, ought not the last bargain — the price being the same in each — to be looked upon as having been made, substantially, in compliance with the first contract, as it was, expressly, upon the supposed wishes of the party to that contract ? Carpenter is put out of the way, because he would not rely on Falls’s default against him. Are the others in a posture to raise the objection, simply because he might have done it, though he did not ? Notice subjects them to all the equities against Carpenter ; but their conduct may prevent them from being entitled to all his *272 defences against Falls. Now, whether Carpenter told them the contract with Falls was not binding, or they told him so, it is certain that Carpenter would not have made them a deed, as the contract had not been actually can-celled, if he had not believed that Falls fully assented to it. This they knew perfectly was not a fact, though they represented it to be the fact. They assign certain reasons why the opinion they attribute to Carpenter, that “the bond was void,” and that Falls had abandoned, might have been deemed correct by them. But they could not deny a knowledge of other facts, notorious to them, that proved conclusively that he had not, in truth, abandoned, though his claim might not have been valid in law. They knew that he was in possession; that he was cultivating a part of the land; that he had discovered gold, and was engaged in collecting it; that he had given leases to others for the same purpose; and above all, that he had refused a lease for a part, to the very person who pretended that Falls was willing that he might take an absolute conveyance for the whole. They knew that he was not only able, but in a very short time, would be ready to pay the purchase money; and that if he did, Carpenter felt himself bound (whether he was or not in law,) to make the deed to Falls. Yet they hold out, that he could not pay, and did not wish to have the land, studiously producing or confirming that belief. They got, then, the title from the person in whom it was vested, because that person was governed by the wishes of Falls, as having a prior claim — a claim which he was willing might be renounced, but also ready to recog-nise, as the right, if asserted. It would have been as beneficial to the claimant, and it was as effectually used by the other parties, as the most perfect right could have been. After pretending to be substituted to it, and thereby gaining the legal title, can they supersede the thus acknowledged right, by the objection that it was not legally valid 1 It should rather seem, that whatever it was before, it was thereby made valid, as against them. But as little was said in the argument upon this view of the subject, the Court has considered the case upon the points, on which the counsel placed it, and on which it will be decided.
Evidence» to prove the rescinding °Jrlacv™t' tract by a quentparol agreement clear, posi-ti7e>and above suspicion.
The first objection on the part of the defendants would be fata!, if founded in fact. It is, that the contract was expressly rescinded by a subsequent parol agreement. But to this allegation, there is no evidence while it require that which is clear, positive, and above suspicion. Ilul- . 1 1 left s testimony comes the nearest to it. He states a pro position by Falls; but no assent on th'e part of Carpenter. Besides, the witness is mistaken as to the time; for, more than a year.after the one load of corn, which Hullett saw Andrew Falls deliver, four other loads were delivered for him (1828.) by John Falls. The parties, therefore, acted on the contract after ,the time Hullett speaks of; which i • , ' i proves that it was not then rescinded. As late as . the spring of 1829, Carpenter sent for further payments ; and the defendants have themselves examined witnesses, who can go no further towards establishing even abandonment, than to state Falls’s .declarations about this last' period, that “ he would have to give up the larid,” or that he “ must give it up because he could not pay for it.” The Court must therefore declare that the contract was not rescinded by agreement between the parties.; and that it was not expressly renounced or abandoned by the plaintiff Falls. Those declarations are only indicative of his fears, as to what necessity or.convenience might require him todo, and not of a past or immediate refusal to proceed'on the contract; for he still continued to act as owner, and to strive to raise the purchase-money by a mortgage of his other property. He is therefore entitled to the common decree, unless other reasons render it unfit that he should have it.
The substance of the objections consists in the failure of Falls to pay the purchase-money punctually ; and in his insolvency, which rendered him .unable to perform his agreement, until the land rose in value, and then only out of the land itself; and in the great increase of value, immediately before he offered to cpmply. The argument for the defendants did not distinctly proceed upon those grounds severally, as if any single one of them constituted a bar to the relief; though the pnricipal proposition taken, was the general one, that time is material in equity, and *274 is deemed of the essence of the contract, and therefore the relief must be refused ; and the other circumstances were invoked to sustain that doctrine, by showing its reasonableness, in its application to this cause. It struck us that it required, the whole, to makfe the argument plausible; and that if any one of the positions be false in fact, or immaterial to the conclusion, the whole proposition must fall.
The allegation of insolvency is unfounded. There was no change in the circufnstances of the plaintiff, except for the better; and he was fully able to pay th'e debt. Had he been insolvent, it would be a question how far one who contracts with a person, known by him to be in that situation, could, after an increase in the value-of the estate, allege, for the first time, that as a reason for annulling the contract; or why a court of equity should not give full effect to it. It might form a proper motive for inserting in the contract a clause, that default should avoid it; and be a reason with the court for holding, in such case, that the provision was not formal, but substantial. But when the vendor retains the title as a security, and, also, takes bonds of the vendees, ás a separate and absolute obligation, binding on the person, and recoverable without showing performance on. the -part of the. vendor; and likewise deals with an insolvent person, as if he were solvent, by leaving him in the articles, at large, as to time, it is not seen how the court can put a construction on the instrument, founded on the circumstance of insolvency, as indicative of the intention of the. parties. Insolvency, whether existing at the time of the' contract, or occurring subsequently, if continuing, so as to disable the purchaser from fulfilling' his contract, may authorise the other party, after request and default, to renounce the-contract; and, after reasonable notice, may discharge him ; or it may be evidence, with other things, of abandonment by the purchaser. But in that case, it may also be repelled by other evidence that there was no abandonment in fact. Insolvency, by itself, does not dissolve the agreement; nor put it in the power of either party to treat it as dissoluble; at his will merely. But it is useless to speculate upon the consequences of that *275 circumstance, if it existed; it is not the fact, and therefore cannot be brought to bear on the argument.
It is otherwise with respect to the increase in the value of the land; which, at any rate, will bring a great deal more in the market than the contract price. It might be well, however, to ask, who now urges this fact; and whether that party can avail himself of it? Carpenter’s interest in the subject in litigation is excluded, as already stated; and the decree, as one for specific performance, if made, must be against Birchett and Ormond, who have the legal title. They are alone interested; and they bought after they knew of the increased value; Falls, before it was discovered. It is not a case of turpitude, in which equity will not interfere, but leaves the possessor to his advantage, because the other has no merit on which it can be taken away; it is simply an objection that equity ought not to transfer so valuable an estate for so little money. Does that lie in their mouth, when they were to give precisely the same sum, and had. notice of the other’s purchase? But not to speak of that: it is certain that the increase of value is not such a change in the subject-matter of a contract, as is, of itself, a ground for rescinding or not enforcing articles. The thing contracted for, is, in equity, considered the purchaser’s, from the time of the contract, and stands as a security only, to the seller. Ordinarily, therefore, advantages or disadvantages, arising subsequently, either from unforeseen accidents, or from contingencies, on which the value was known at the time to be dependent, cannot be a cause for refusing to enforce an executory agreement, more than for annulling an executed conveyance. Paine v. Meller, 6 Ves. 352. Pritchard v. Ovey, 1 Jac. & Walk. 403. Revel v. Hussey, 2 B. & Beat. 287. What happens to the property, while the contract is in full force, cannot alter the respective rights. If one of the parties refuse to perform, and there comes a change of .circumstances, upon the strength of which, he is desirous to go on with the bargain, and insists on it, he may properly be repelled, although hé was not watching for that change; because a favourable chance ought not to profit him who would not run the risk of an unfavourable one. *276 '"'^e manner> if a loss arises by a fall in value of things of fluctuating price and subjects of traffic, and the vendor could not or would not make a title, according to his eon-tract, in which case the purchaser might have avoided the loss, the former,' having caused the loss, ought to bear it; and cannot compel the other to take the property. This brings us to the consideration of the grounds of decreeing specific performance, and of what is deemed a fault of the p^rty, wffiich shall defeat this relief.
// Jt has been contended, that the non-payment of the pur- [' chase money at the day; or, at any rate, that circumstance, with any other slight one of inconvenience, or loss to the seller, is a sufficient reason for refusing it; and that here, the delay and the change in value, discharge the vendor. The jurisdiction was traced to its origin, and it was said, that its principle was to execute specifically, a contract legally, valid; and, therefore, that time must be essential in equity, because it is at law; and many cases were cited, and minutely criticised. Certainly, the cases'show, that, under a great variety of circumstances, the court has refused the relief, when the party applying was in default in respect to the thing to be done by him, or in respect to the time in which the thing was to be done, and circumstances had then so changed, that performance by him would not put the other party in the same situation, as if it had been done in due time. On the other hand, the cases are as numerous, in which the relief has been given, where there was default in those respects; and a change in the title or value of the property, upon the ground of the conduct of the parties, before or after the alleged default occurred. We do not think it necessary to examine all the cases, nor to dwell much on the elementary principle; for we think the facts of this case are such, that the decree, we feel obliged to make, will not be in conflict with a principle established, or a precedent furnished, by any one of the cases in the books. //
What the Court deems the material circumstances of the case, may be, in a great degree, gathered from what has been already said. But it may be well to group them together. The plaintiff agreed to give seven hundred and *277 fifty dollars for the land, and executed two bonds for the price, payable, with interest, at one and two years, the last of which fell due in November, 1828; and took a bond from his vendor to convey “ at the payment of the purchase-money.” He went into immediate possession, or rather continued that derived under a former contract; and acted in all respects as owner, without any objection on the part of the vendor, up to the moment of the sale, made by him to the other defendants; which occurred between nine and ten months after the last payment fell due. In the mean time he repeatedly made payments, altogether to the amount of two hundred and forty dollars; of which he agreed that a part should be applied to another debt, and about the sum of one hundred and forty dollars, including interest, remained applicable to the debt for the land; and also, in the mean time, he discovered a gold mineen the land, of parts of which he gave leases, and was exerting himself to.raise money,,to discharge the balance on his bonds. The vendor did not wish him to give up, but wished him to complete the purchase. He had never renounced the contract; but had expressed, not to the vendor, but to others, the fear that he would have to do so, as he did not expect he could make the payments as soon as they might be wanting. We think these facts constitute the case of a contract partly performed, and in the course of execution; and continuing, clearly, by the consent of both parties. And we are of opinion, that relief could not be denied in such a case, even if there has been a default, after it has been thus acquiesced in. There is no case to give countenance to a decree for the defendants.
Time may be of the essence of the contract in equity. Exact punctuality may be of great importance to the interests of a contracting party in many situ-, ations. In some, it is cbvious stae of the property Scum-01 stances. we do not doubt that mentmay edastoam" show, that smntiilUl)" partofthe Inthose cases, the cou.t can no more dispense with it, th .n any ether vital provision. But the parties themselves may; and it is in that sense true that time is not essential, but immaterial, when comparing its effect in that Court, with that at law.
*277 f/ It is not denied that time is material- in equity. It is 'always respected here. Nor is it denied that time may be of the essence of a contract. Exact punctuality may be of great importance to the interests of a contracting party in •many situations. In some, it is obvious, from the state of the property and other circumstances. In others, we do not doubt that the instrument may be so framed, as to show what is true, namely, that it is a substantial part of the contract. In those cases, a Court can no more dispense with that than any other vital provision. But the parties *278 themselves ran dispense with it; and the inquiry, where it has once existed, is, whether they have dispensed with it. It is in that sense true, that time is not essential, but immaterial in equity, when comparing its effects here with that |aw. never was, and cannot be regarded in both . ,. , T . ° ~ , Courts in the same light. It is true, a maxim is found, ^lat eclu*(y does not decree performance of an agreement, upon which an action would not lie at law for damages ; anc* anciently it was the usage to send the party to law. But that was to determine whether the agreement was so constituted as to have become binding at any time — ■ whether it ever was a legal contract; and not whether the party had lost his legal remedy by accident, or the non-observance of a provision, deemed inequity merely formal. But the jurisdiction is established now, upon the v'evv °f ^6 Court of Equity, as to what forms a sufficient contract, and it is beyond a doubt, that some are so considered, which could not be stated to a court of law, as for example, the cases of parol contracts with part performance, under the statues of fraud. And in.respect to time, so far from equity being governed by it as a conclusive bar, it was one of the earliest jurisdictions to relieve against it, as in the case of penalties. Suppose a day to be fixed for Carpenter to make a deed, and that he made after the day, at law the penalty of his bond might be recovered. Ought equity to allow that? Certainly not; and would not. It could not be tolerated, that with the deed in his pocket, Falls should say, “ I stand upon the bond, and that every provision in it, time included, is of the essence.” If he could not say that, how can the other party? Time, with the conduct of the parties is material here, while the conduct of the parties is nothing at law. The law is necessarily confined to the time specified in the deed : because the declaration is on the deed in his verbis, not to be varied by another agreement or mode filed, by acts en pais. But, here, the contract is for the thing which thereby becomes the property, and at the risk of him who contracts to get or take it, and the other party ought not to insist on its forfeiture for a slip, but only on compensation for the loss thereby arising to him. Interest on the *279 purchase-money, generally places him in as good a sitúation, as if there had been no default. It is therefore general doctrine in equity, that time is not of the essence of the contract. In cases in which it is seen really to be essential, that is, where it must have been understood by the parties at the. time of the contract, that events would probably happen, in which interest would not be a compensation, because thé title to the property, or its value might be greatly affected by those events, and one of them holds back until the contemplated contingency happen, that person cannot apply to enforce the contract which he has violated, and violated in bad faith, and as to a main ingredient of the bargain. Upon this principle.rests the cases upon sales of reversions, stock, and other uncertain interests or titles. To decree a specific performance, in those cases, to the defaulter, would be to make a wager binding in favour of him who refused to put up his stake, because if he had put it up, the event proves he would have won.
Default m respect to timéis not °x-ceptinpe-culiar eases; but e.vi-°thcr and °*°ybere butted. j^juic'asfi bemadees. whereitis, itd°es not follow, that iusneces-s?ril7 c.on" equity,asit is at law‘ time may ¡je walved as may any over stipulation introduced for his benefir
*279 Default .in respect of the time is not therefore a bar 0f . • ... , # • itself, except in peculiar cases; but is only evidence, with other things, of abandonment, and of course may be rebutted. It may in all cases be made essential; but where it is, it does not follow that it is necessarily conclusive in equity, as it is at law. It cannot be made thus sive here; that is to say, so as to' preclude a party from showing that it ceased to be essential, as is the case at'law from the form of pleading, and the mode [proof. But it is never to be forgotten, that in equity a party may waive, and it may be shown that he did waive, -a stipulation introduced into a contract for his benefit, whatever may be the subject or the terms of the stipulation, It was said, indeed, by the counsel for the plaintiff, that both parties must be active, and that, even if articles i i i tu . « . expressly state, that the agreement shall not be.binding, unless performed at the time, a party cannot avail himself of it, unless before the first default, he give notice that he will take advantage of it. That would be going very far towards saying, that time could not be made essential; tor if the contract be not notice enough to the parties, it would be difficult for the Court to perceive upon the same instru *280 ment. that it was essential. But a failure to avail himself of il, at the first fit occasion, and before or when the other the agreement, may begins after default, to act again on produce a very different re¡,ult. He gives up, therein', part of the contract, as much as the other by his default, if insisted on, relinquishes the other parts of it. Thus far we think it correct to say, that both parties must be active. A small matter may amount to such waiver; any thing that draws on the other parly to execute the agreement afterwards, or that shows it is chimed a subsisting agreement after the essential default. In Seton v. Slade, 7 Ves. 264, the purchaser’s takingahe abstract, although not bound to do so, and stating objections to the title, overruled his defence. In Hudson v. Bartram, 3 Mad. Rep. 440, Lord Eldon admitted the time to be of the essence of that contract, and it was expressed. Yet he held the vendor to be bound, because, when the vendee excused his default by letter, he did not reply to it; and afterwards referred á person entitled to a charge on the premises to the vendee; and avoided the vendee, when he subsequently sought him according to the engagements of his letter. The vendee could not assert the inconsistent rights of owner and vendor at the same time, and therefore the purchaser had a decree. If the party has been guilty of any unfairness; or his delay was with the view to test the value of the bargain before he acted on it; or there is satisfactory evidence from circumstances, that he once abandoned,or he has wholly failed to perform any part, and^ a loss has thereby ensued to the other party; in those cases the justice and the law are both manifestly against him* that is in fault. Of one or the other of those descriptions, are all the strongest cases cited for the defendants. In Lloyd v. Collet., 4 Bro. C. C. 469, the vendor wilfully delayed to furnish the abstract, though repeatedly requested, for six months after the vendee had sued for his deposit, and the subject was one of fluctuating price, and an object of speculation, and had fallen. In that case, it was said that a patty’s own neglect was a singular head of equity'. Certainly it would be where, as in that case, nothing, had been done. Hence Lord Loughborough, 4 Ves. 690, note, *281 asks the plaintiff for a case to prove that where nothing had been done, the time was not essential. But nothing done on one side, and advantage properly, and in due time taken of that on the other, is very different from part performance, without any attempt to put an end to the contract by the other party, by notice of any sort. To make that case in point here, “ not every thing” and “ nothing” must have one meaning. In Brashier v. Gratz, 6 Wheat. 528, the purchaser had done nothing. .He could not take possession, for the property was in litigation, which he was to manage, and for which he had received compensation. He was to have a special warranty, and in case the land should be lost, half the price was to be returned to him. He became insolvent subsequently, and failed to pay any part of the price, and likewise failed to attend to the suit at all, and at the same time refused the vendor’s offer to rescind. The vendor was then obliged to prosecute the suit, or lose the whole price. When gained, the land rose suddenly, and Brashier raised his p.urchase-money on the credit of it, and tendered it, and claimed a conveyance. A decisive objection was, that he bought the title as a doubtful one, but would not take it as such, nor as long as the price he agreed to give was fairly the value; but claimed it when the title ceased to be doubtful, and the value increased greatly. It was a case, within the principles of those of reversions, where nothing has been done until the life falls in. In Alley v. Deschamps, 13 Ves. 224, there was a sudden unforeseen rise; but that did not govern the judgment; it only proved the dishonesty of the plaintiff’s motives. Lord ERSkine, plainly went on the abandonment of the assignees. The purchaser took possession, and became bankrupt, after paying a less sum than the rent during the time he occupied. Bankruptcy is stronger than insolvency, because it is an absolute discharge; and it was once supposed to dissolve the contract, though it is now held otherwise. Brooke v. Hewitt, 3 Ves. 255. Butoalthough the assignees, might have claimed the benefit of the contract, they did not. They never entered into possession, and therefore were not liable for the purchase-money, unless the vendor chose to come in under the commission, whch *282 they knew, of course, that he would not do. As soon as the value rose, and the assignees could certainly pay the purchase-money out of the estate on which it was a lien, they wished to make themselves liable for it, and take the estate. No, said the chancellor: You must not “ lie by with a view to see, whether the contract will prove a gaining or losing bargain, and according to the event, either to abandon, or, considering the lapse of time as nothing, to claim a specific performance.” The decision is nothing more than that a party cannot elect to abandon or not, as it may appear hereafter to be his interest. He must decide at the proper time; and the decision once made is conclusive. The bankruptcy alone did not discharge the contract; nor was the relief refused, because the value had increased. But it was because the whole price remained unpaid, and nothing had been done after the bankruptcy; which was an abandonment.
A failure to avial himself of it, on the first fit occasoion, and before or when the other party begins after a default to act again on the agreement, may amount to such waiver.
*282 The present is not like the case of Hatch v. Cobb, 4 John’s C. C. 559, which was much pressed at the bar. There was no acquiescence, but express notice that the vendor must sell again, and the purchaser had covered all his property by a recent judgment, and there was no separate security. All the vendor could do was to get his land again, and he gave the other the opportunity of paying for it, and keeping it. But this question could not arise in that case, because the second purchaser was not a party to the suit, and the bill could not, at any rate, lie for damages alone. In Benedict v. Lynch, 1 Johns. C. C. 371, the purchaser was let into possession, it is true. But the contract for purchase was expressly rescinded, and a new one made for a lease for one year, under which the plaintiff enjoyed the term, and moreover, he told the second purchaser, who inquired with a view to making a contract, that he held only for the year, and had given up his purchase. In Harrington v. Wheeler, 4 Ves. 686, the sale was of a reversion, and the vendee did not take possession, nor do any thing until he filed his bill, six years after the contract, and one year after the death of the tenant for life. This case is taken notice of in Alley v. Deschamps, as one in which money was paid, but it hardly deserves *283 that character. The vendee advanced one hundred and four pounds at the contract; but he took a mortgage on the estate for that, and just before suit, demanded it as a debt, from the .second purchaser. Besides, the object of the sale was to pay off a heavy mortgage, which the plaintiff agreed to discharge; and the second purchaser, who. was originally joint-owner with the .plaintiff’s vendors, was, to save his own share from being foreclosed, compelled' to buy the other shares, and discharge the mortgage himself. That case was therefore one both of bad faith, and of unequivocal abandonment.
The assignment of a cestui que trust, if he or his trustee be in possession, is not champerty or maintenance, though another may have interpart of the land,
*283 The present case, on the contrary, stands on the common equity of a contract; for an estate in. possession. The purchaser is in arrear for a large part of the purchase-money for nine months, but is fully able to pay it, and the vendor acquiesces in the default during the whole time; and then, without any notice whatever, makes a second sale to, a person, with full notice, not only, had before, but repeated to him at the time by the vendor himsélf./^Hav-ing allowed it to subsist after the default, he cannot put an end to it by an act, which, supposing it to subsist, is in violation of it; but to that end, there must be a previous, formal, and reasonable notice, that if'the purchaser does not fulfil 'it, the other party will not hold himself bound.^ This would be the law, if the purchase-money was only secured by the articles, and the time specifically made essential therein. It is much clearer, when the vendor holds the bonds of the other party, and does not offer to surrender, them. Upon this agreement, the time also seems to be as much at large as it could be, unless it had expressed that it should not be material, arid left the money to be paid during the purchaser’s life-time, unless hastened by request.
An objection was made-to the assignments by Falls, upon the ground of maintenance or champerty. But a cestui que trust may surely assign when he or his trustee is in possession, which has been the- casq at every moment since his purchase. He has never been out of possession, and contracted on the land. The occupation of a small part by the others, for a short time, cannot affect his con *284 veyances, even if that could be regarded as tortious as J. . ° against him, upon the ground that they are only construc-lively trustees.
We think, therefore, that the plaintiffs in the original bill are entitled to the usual decree for specific performance, , 1, / and to be quieted in the possession by injunction ; and that Birchett and Ormond, and those defendants who claim under them, must pay the costs; and that the cross-bill of Birchett and Ormond must be dismissed with costs. Those decrees extinguish all claim of the Carpenters to the land ; and consequently their cross-bill must also stand dismissed, as against Birchett and Ormond, and without the necessity of determining the question of fraud from their imputed concealment or representations, touching the discovery of gold; but without costs to those defendants.
Per Curiam. Decree accordingly. •